UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WAYNE FRAZIER,

            Appellant,                      Case No. 13-10227
                                                      Honorable Thomas L. Ludington

v.

HOWARD MILLER and
JEAN MILLER,

            Appellees.

_____/

**OPINION AND ORDER AFFIRMING BANKRUPTCY
COURT'S DETERMINATION OF NON-DISCHARGEABILITY**

Wayne Frazier withheld money from his business partners Howard and Jean Miller and the company the three organized—J&W Transportation, LLC (J&W). So J&W and the Millers filed suit. On October 23, 2008, a Michigan Trial Court concluded that Wayne owes them a total of $203,681[1] (not including attorney's fees and costs). Wayne appealed the ruling, and then on January 8, 2009, he filed for bankruptcy protection. Subsequently, in June 2010, the Michigan Court of Appeals affirmed the trial court's determination. *See J&W Transp., LLC v. Frazier*, No. 289711, 2010 WL 2178555 (Mich. Ct. App. June 1, 2010).

Howard and Jean Miller then filed an adversary complaint in the United States Bankruptcy Court for the Eastern District of Michigan, asserting that the debts Wayne owes are not dischargeable under 11 U.S.C. §§ 523(a)(2), 523(a)(4), and 523(a)(6). The Millers argued that the entirety of the debt arose from Wayne's fraudulent acts. The bankruptcy court agreed,

---

[1] The court determined that Wayne owes the Millers $43,147 based on unjust enrichment; $80,501 for fraud and misrepresentation; and $57,737 in lost profits. The court held Wayne owes J&W $22,296 for start-up costs that have not been repaid.

and held that the debts Wayne owes the Millers and J&W are excepted from his discharge in bankruptcy.

Wayne now appeals that determination.[2]  Based on what follows, the bankruptcy court's holding will be affirmed.

<div align="center">

**I**

**A**

</div>

Wayne originally met Jean while the two were employed by Total Transportation,[3] a regional trucking company located in Michigan.  Jean worked as a dispatcher and Wayne drove his own tractor-trailer as an owner-operator.  Convinced they could capitalize on their combined expertise, Wayne and Jean, along with Jean's husband Howard, formed J&W in 2001.[4]  The articles of organization for J&W were filed with the Michigan Department of Commerce on August 24, 2001, at which time its assets consisted of two trucks contributed by Wayne (worth approximately $20,000), and $20,000 in cash contributed by Jean and Howard.  As a result, Wayne held a 50 percent interest in J&W while Jean and Howard each maintained a 25 percent interest.  Upon its inception, J&W leased its equipment to Total, and both Jean and Wayne continued to work for the company.

Although J&W initially only had two trucks (those contributed by Wayne), Howard and Jean quickly moved to obtain more.  They bought "four other trucks through Citizens," which were funded "with a note that was to be deducted out of J&W's account on a monthly basis."

---

[2] Notably, Wayne does not contest the bankruptcy court's determination that the $80,501 awarded based on fraud and misrepresentation is not dischargeable.  He does contest, however, whether the other awarded amounts are excepted from discharge.

[3] For simplicity, all references to this company will be to Total, although it began as Bay City Trucking, then became Bestway Systems, and eventually was bought by Total Transportation.

[4] Howard was to act as a "silent partner."

Bankr. R. A, at 144, ECF No. 2.  To sustain J&W's account, the Millers took out an "equity line through [their] house" with Standard Federal.  *Id*. at 142–43.  They then used funds from the home equity line of credit to purchase additional trucks.  J&W acquired three trucks in August 2001—for a total of $82,653—with cash Jean and Howard supplied from the home equity line. On September 20, 2001, J&W purchased a tenth truck with a down payment of $27,551, which was again "written directly out of [the Millers'] equity line from [their] house through Standard Federal."[5]  *Id*. at 146–47.  According to Jean, Wayne was "aware that J&W was paying on those trucks."  *Id*. at 149.

In 2003, when Jean and Howard sold the home that had the attached equity credit line, Standard Federal paid off part of the credit line by taking proceeds from the sale of the home, leaving $95,464.08 unpaid.  J&W did not have the funds to pay off the remainder, so Jean suggested J&W carry a loan to the Millers for seven years at "seven or seven and a half percent interest at a payment of $1,440 per month."  *J&W Transp.*, No. 289711, 2010 WL 2178555, at *1.  Jean and Howard paid off the remainder of the credit line, and a loan subsequently originated in August 2003, which J&W began to pay in September 2003.  Jean drafted a promissory note between J&W and the Millers reflecting that the $95,464 would be paid at seven percent interest for 84 months.  Bankr. R. A, at 575.

When J&W required additional credit for expenses, Jean and Howard used their low interest credit cards.  Business expenses such as license plates (which averaged $2,000 to $2,500 per truck per year) and cash advances for J&W were put onto the cards.  According to Jean, the

---

[5] According to Jean Miller, the check "was paid for directly out of J&W, but the money was deposited from our line of credit, again, from Standard Federal into J&W and then the check was written out of J&W's account." Bankr. R. A, at 147–48.

cards were never used for personal expenses. *J&W Transp.*, No. 289711, 2010 WL 2178555, at *2.

J&W sought minority status in 2004 based on Wayne's Mexican heritage. Jean, Howard, and Wayne believed the company would be "able to get contracts if [it] could get the minority status." Bankr. R. A, at 137. Jean testified that "it was a step forward for a possibility of growing the company on our own." *Id.* As a result, Jean and Howard each transferred .5 percent (totaling 1 percent) of their ownership interest in J&W to Wayne. Accordingly, Wayne became the majority shareholder with a 51 percent ownership interest in the company.[6]

At the same time J&W was seeking minority status, the parties contemplated Wayne's company—W. L. Frazier Trucking, of which he was the sole owner—also pursuing minority status. Jean and Howard believed they, and J&W, would benefit from W. L. Frazier obtaining minority status because "that would create more business and then with more business the trucks would be able to move . . . more loads which would create more revenue." *J&W Transp.*, No. 289711, 2010 WL 2178555, at *2.

So in January 2006, Wayne applied for minority status on behalf of W. L. Frazier. Around the same time, J&W's minority status application was denied because "Jean had financial control of J&W. J&W lost its appeal of the ruling." *Id.* While W. L. Frazier sought minority status, J&W paid its expenses, including start-up costs, insurance, and W. L. Frazier's employee salaries. Bankr. R. A, at 203. J&W ultimately advanced W. L. Frazier $22,296 in expenses. *Id.* at 205. Jean testified that she and Howard agreed to the arrangement "[b]ecause

---

[6] One issue that will not be discussed at length, but requires some comment, involves Wayne's signature on various documents. Because of Jean's employment with Total, it was determined that she should not sign the payroll checks to drivers working for J&W. Although Jean originally signed some of the checks, Wayne acquired a stamp of his signature for Jean to use in this regard. Wayne was aware that the stamp was used for things other than payroll and testified that there were specific instances where Jean would request to use the stamp and he would give permission. Regarding the transfer of ownership interest, however, Wayne testified that he did not give permission to have his name stamped on the assignments. He believed the assignments were valid without his signature. But Wayne did not dispute receiving the additional one percent interest from the Millers.

-4-

previous to this we had discussions about the roles of [sic] if W. L. Frazier got in his minority status, how it would benefit J&W and how it would benefit Howard and I[sic]." *Id.* at 204–05. Howard testified that minority status for either company would benefit the parties with "better distributions, better profit, better business for J&W." *Id.* at 396. W. L. Frazier did acquire minority status sometime in 2006.

Wayne and Jean continued to work for Total through August of 2006, and J&W continued to lease its trucks to Total (then numbering thirteen—one owned by Wayne and 12 owned by J&W through the use of the Millers' funds). But Total's vice-president testified that Wayne consistently "threatened to – that he was going to pull his trucks. He was going to go into business for himself." *Id.* at 181. So, "after numerous threats," Total decided "to terminate him." *Id.* The same day, Jean "tendered her resignation" in order to "go to work for Wayne." *Id.* at 180–81.

Because W. L. Frazier had achieved minority status, and J&W had not, J&W terminated its leases with Total and instead transferred use of its fleet (all twelve trucks) to W. L. Frazier. By October 2006, all of J&W's trucks "were running under W. L. Frazier." *Id.* at 161. But J&W was not receiving freight payments for the operation. *Id.* at 162. Jean testified that, "effective November J&W trucks were being used by W. L. Frazier. So, all the money had been going into W. L. Frazier's account. Nothing was going into J&W's . . . ." *Id.* at 160. Despite this fact, Jean and Howard agreed to the arrangement because "Wayne and Jean were going to move forward with J&W Transportation and W. L. Frazier together and that it would all benefit J&W." *Id.* at 398.

By late 2006, Wayne had leased thirteen trucks (one of his own and J&W's twelve) through W. L. Frazier to Dallas Mavis, a freight hauling company similar to Total. Although the

Millers were not part owners of W. L. Frazier because it would jeopardize the company's minority status, Wayne led them to believe they would benefit nonetheless from the arrangement.  Jean testified,

> Q:   What words, if you recall, did Mr. Frazier use that you attribute to representations that you or your husband would have an ownership interest in Frazier?
>
> A:   He had said that we would – we could not be part owners because of the minority status.  That we'd have a legal document written behind the books to say that we would – that we would benefit from W. L. Frazier.
>
> Q:   You'd have a side deal?
>
> A:   Correct.
>
> Q:   And the benefit of the side deal, was that defined what the benefit would be?
>
> A:   The profits from W. L. Frazier.

*Id*. at 207–08.  Jean established that she would not "have allowed Frazier to have used those units had [she] not believed [she] would receive compensation for the use of those units."  *Id*. at 209.

In November 2006, Howard loaned W. L. Frazier $50,000 because the company "needed some cash flow" to ensure its business prospered with Dallas Mavis.  *Id*. at 210.  One month after the loan, a promissory note was executed—which Wayne personally signed—which reflected that Wayne would make monthly payments to Howard in the amount of $1,232.42.  Bankr. R. B, at 83, ECF No. 3.  The note established that the entire principal balance would become "payable in full on December 16, 2009."  *Id*.  The document included a personal guarantee from Wayne, which was notarized.  *Id*. at 84.  Howard testified he "wouldn't have made the loan if [he] was under – the understanding that J&W was not going to benefit from W. L. Frazier running the trucks and keeping the money."  Bankr. R. A, at 400.

-6-

Jean stopped working for W. L. Frazier and Wayne by the end of 2006; she testified she quit while Wayne testified she was terminated. *J&W Transp.*, No. 289711, 2010 WL 2178555, at *4. According to Jean, "Wayne was difficult to work with and was not putting any money into J&W, making it difficult to pay J&W's bills." *Id.* To pay J&W's debts, Howard and Jean were absorbing expenses "by paying them with their personal credit cards. J&W received no compensation for the use of the trucks after May 2007. When Wayne stopped paying anything," *id.*, Howard, Jean, and J&W filed suit.

Both Howard and Jean testified that they made contributions to W. L. Frazier, and let W. L. Frazier lease J&W's trucks, because they expected to benefit. *Id.* at 207, 400. Wayne acknowledged that J&W paid W. L. Frazier's operating expenses. He testified that his salary was paid by J&W. He agreed that Howard loaned W. L. Frazier $50,000. But despite all of this, Wayne testified that he did not, "at any time, have any intention of providing a share of the profits of W. L. Frazier to Jean or Howard Miller." *Id.* at 426.

Howard, Jean, and J&W "initially had their counsel send a certified letter to Wayne on May 25, 2007, indicating that he either needed to make a weekly payment to lease the trucks or stop using them." *J&W Transp.*, No. 289711, 2010 WL 2178555, at *4. Wayne acknowledged the letter and agreed to either form a lease agreement or return the trucks; but the trucks were not returned and no lease payments were made. *Id.* So on July 26, 2007, the trial court entered a restraining order that required Wayne to "absolutely desist and refrain from damaging, destroying, concealing, disposing of or using the truck tractors" J&W had leased to W. L. Frazier. *Id.* at *5. In October 2007, ten of J&W's twelve trucks were sold for $8,000 each. The money from the sale was placed into an escrow account with Howard, Jean, and J&W's attorney.

In May 2008, Howard, Jean, and J&W filed a motion to show cause, alleging that W. L. Frazier was utilizing J&W trucks contrary to court order. *Id*. Attached to the petition were various settlement statements from Dallas Mavis and Mason Dixon (another trucking company) "evidencing multiple trips by one of J&W's trucks to places in Virginia, Indiana, Ohio, Kentucky, Florida, New Jersey, Maine, Illinois, Delaware, Missouri, Texas, Arizona, and Georgia as well as multiple locations within Michigan, with payments made to [W. L.] Frazier Trucking." *Id*. Jean testified that this particular truck—numbered 4234—had not been sold along with the ten others "[b]ecause Mr. Frazier said that that truck was no longer operatable [sic], that the injectors had gone out and it was going to cost around $5,000.00 to fix it and he wasn't going to fix it." Bankr. R. A, at 237.

The Michigan Court of Appeals discussed Wayne's testimony regarding the rogue truck as follows:

> Wayne testified that he was aware of the court orders related to the use of the truck. Although he testified that truck 4234 was operable but not currently licensed, another witness testified that truck 4234 was licensed with current Indiana plates. Wayne testified that truck 4234 was not operable for anything other than local usage because it was an older tractor and "under powered." He believed truck 4234 was only used within Michigan. He reviewed an independent contractor agreement with Mason Dixon signed by him, and agreed that it included truck 4234, which was listed as "active" for interstate usage, but indicated that he had not intended to make that unit available for interstate carrier business. He admitted that he signed the independent contract agreement including truck 4234 only 14 days after he testified at his deposition that truck 4234 could only be used for local use, but denied that the independent contractor agreement committed truck 4234 to interstate transportation of goods.

*J&W Transp.*, No. 289711, 2010 WL 2178555, at *5. Truck 4234—owned by J&W—earned revenue for W. L. Frazier in the amount of $19,744 from Dallas Mavis and $3,122 from Mason Dixon between October 2007 and May 2008. Bankr. R. A, at 218. Jean testified that the truck "should have been shut down back in August and never moved another inch. After the sale I

assumed it was still out of commission, that it was unusable. That's the reason why we didn't sell it." *Id*. at 241.

By the time the case moved to trial in the Isabella County Trial Court, J&W's assets consisted of two trucks (4234 and one that was disabled) and $61,000 in escrow from the sale of the other trucks. Jean and Howard were still making monthly credit card payments on J&W debts, and estimated the company's liabilities at "roughly $80,000." *J&W Transp.*, No. 289711, 2010 WL 2178555, at *6.

## B

As previously noted, Jean, Howard, and J&W filed a complaint against Wayne and W. L. Frazier on July 26, 2007. They alleged six causes of action: (I) claim and delivery; (II) fraud and misrepresentation; (III) breach of fiduciary duty; (IV) unjust enrichment; (V) conversion; and (VI) breach of contract.

A bench trial was held concerning the claims on July 21, 22, and 28 of 2008. The court then issued a bench opinion on October 23, 2008. Concluding the first paragraph in the findings of fact section, the court expressly indicated that "[t]he court finds specifically that the credibility of Mrs. Miller far exceeds that of Mr. Frazier." Bankr. R. A, at 520. The court then discussed various findings of fact.

Concerning the line of equity the Millers took out on their home to fund J&W, and the subsequent $95,000 promissory note for repayment, the court concluded as follows:

> In August of 2003, the Millers sold their home. J&W did not have sufficient cash to repay the line of credit. The parties discussed the situation and the Millers repaid $95,464.00 due on the equity line for the benefit of J&W. Mr. Frazier does not dispute that the Millers used their equity line to fund J&W. It was agreed that J&W would repay the loan by making monthly installments of $1,440.00 to the Millers with eight[7] percent monthly interest. A promissory note was drafted to

---

[7] As noted, the promissory note indicated the payments would be made at seven percent monthly interest, not eight. *See* Bankr. R. A, at 575. The reference to eight percent interest was erroneous.

> memorialize the agreement and Mr. Frazier's name was stamped on the note. Mr.
> Frazier confirmed that he had knowledge of the agreement and payments being
> made when he continued to make payments on the loan. . . . Currently,
> $43,147.00 remains due on this note.

*Id.* at 521. The court also established that "J&W provided start up costs to WL Frazier in the amount of $22,296.00, which continues to be outstanding." *Id.* Finally, the court indicated that "[i]n November of 2006, Mr. Miller loaned WL Frazier an additional $50,000.00. Mr. Frazier agreed to become personally liable on this debt by personally signing a promissory note. Currently, $41,490.00 is due on the note." *Id.*

<div align="center">

**1**

</div>

The court then analyzed Howard, Jean, and J&W's claims. In addressing the allegations of fraud and misrepresentation, the court found,

> Mr. Frazier promised the Millers that operation of WL Frazier would benefit
> J&W. . . . Mr. Frazier may not have offered a percentage of partnership interest
> to the Millers but he did promise that J&W and WL Frazier would work together
> to produce income for both businesses and that the Millers would have an interest
> in the profits generated by WL Frazier.

*Id.* at 527–28. The court continued,

> Mr. Frazier knew that if he guaranteed the Millers a part of WL Frazier profits
> that they would rely on his representation. . . . Plaintiffs were damaged as a result
> of their reliance because currently $41,490 remains due on the loan from Mr.
> Miller for start up expenses and personal credit card debt totals $39,011.00 used
> to support J&W while it was not receiving profits.[8]

*Id.* at 528. The court concluded that the Millers "are entitled to repayment of the $41,490.00 due to Mr. Miller for start up costs and $39,011.00 for the credit card debt assumed to cover J&W expenses." *Id.* Thus, based on the claim for fraud and misrepresentation, the trial court held that Wayne owed the Millers $80,501.

---

[8] The total in credit card debt is made up of: $14,872 owed to Advanta; $12,232 to Chase; and $11,907 to the Millers for payments that were made to keep these accounts current. Bankr. R. A, at 528.

**2**

The court also addressed the claims for unjust enrichment.  The first allegation involved Wayne's use of "J&W property, the trucks, to generate income for WL Frazier without compensation."  *Id.* at 529.  After concluding that there was no "valid contract to provide how much is due for use the trucks [sic]," *id.*, and then setting forth the applicable legal standard, the court applied the facts.

First, the court indicated as follows:

> From November of 2006 through October 11, 2007 (when the ten trucks were sold), Mr. Frazier received $635,760.00 in payments from Dallas Mavis for use of the trucks.  From October 11, 2007, through April of 2008, Mr. Frazier received $19,744.00 for use of truck 4234 from Dallas Mavis and $3,122.00 for May of 2008 from Mason Dixon.

*Id.* at 530.  Next, the court applied "an average profit ratio of 10.79 percent"—based on the trial testimony—to the "gross receipts received by Mr. Frazier for the use of the J&W trucks."  *Id.* The resulting amount was then reduced (to represent Wayne's interest in J&W's profits) and combined with the full profits from the use of truck 4234 after October 2007 (because Wayne "violated the court's order to stop using the vehicle and return possession to J&W").   Based on these calculations, the court found that the "Millers are entitled to $57,737.00 for lost profits because Defendants were unjustly enriched by Defendants' continued use of J&W trucks."  *Id.*

The Court did not stop there.  Concerning the funds J&W loaned to W. L. Frazier, the court concluded that the "funds were loaned based on the belief that WL Frazier would be ran [sic] to benefit J&W.  J&W loaned $22,296.00 and based on the testimony provided, this amount was not repaid to J&W when WL Frazier became a successful corporation.  J&W is entitled to repayment of this loan."  *Id.* at 531.

Finally, the court addressed the Millers' claim that Wayne was "unjustly enriched when the Millers were not reimbursed $43,147.00 remaining due on their home equity loan."  *Id.* at

531. The court found that "Mr. Frazier was aware of the debt and acknowledge its terms. The Millers acknowledge receiving some payments on the loan, however $43,147.00 remains due. The Plaintiffs Millers are entitled to repayment of this amount." *Id.*

Before moving on to the other claims—all of which the court found had already been satisfied through the preceding discussion—the court indicated that "Mr. Frazier's conduct is so willful and wonton that it demonstrates a reckless disregard for the rights of Plaintiffs." *Id.* at 532. The court then entered judgment and awarded $80,501 on the Miller's fraud and misrepresentation claim, $57,737 in lost profits, and $43,147 to repay the home equity line pursuant to the Millers' unjust enrichment claim. *Id.* at 535. J&W was awarded $22,296 under the unjust enrichment claim for the funds loaned to W. L. Frazier for start-up costs.[9] *Id.*

Wayne appealed the decision, and it was affirmed in its entirety by the Michigan Court of Appeals on June 1, 2010. *See J&W Transp.*, No. 289711, 2010 WL 2178555.

## C

While the case was pending before the court of appeals, Wayne sought bankruptcy protection on January 8, 2009. Originally a Chapter 13 proceeding, the case was converted to Chapter 11 on May 19, 2009 and to Chapter 7 on September 24, 2009.

After the Michigan Court of Appeals affirmed the judgment against Wayne, Howard and Jean (as unsecured judgment creditors) filed an adversary complaint in the bankruptcy court. They argued that the debts owed to them were not dischargeable under 11 U.S.C. §§ 523(a)(2), 523(a)(4), and 523(a)(6), "claiming that the entirety of the debt arose from the fraudulent acts of [Wayne], despite the amount being apportioned under differing legal theories." Bankr. Trial Op.

---

[9] The court also fined Wayne $7,500 "to compensate for a portion of the profits made when Defendants were wrongfully using truck 4234." Bankr. R. A, at 527.

2. They moved for summary judgment on March 2, 2011. "A hearing on that Motion was held on April 22, 2011." *Id.*

The bankruptcy court, in an opinion dated September 29, 2011, granted partial summary judgment in the amount of $80,501—the amount awarded to the Millers based on their fraud and misrepresentation claims. Wayne does not appeal this ruling. But the court "did not grant summary judgment on the entire amount because issues of fact remained." *Id.* In resolving those questions of fact, the bankruptcy court indicated that "[i]n lieu of an actual trial of the remaining amounts at issue, the parties requested that this Court would review the state court trial testimony." *Id.* Thus, the bankruptcy court "base[d] its Opinion on the state court record and the arguments of counsel." *Id.*

The bankruptcy court then concluded as follows:

[A] careful reading of [the state court] opinion reveals profuse evidence that the state court concluded that the debts at issue in this case stemmed from the fraudulent misrepresentations and willful and malicious conduct of Defendant, and that all of the elements of the various categories of nondischargeable debt under Section 523(a) are met.

*Id.* at 11. The bankruptcy court indicated, based on the trial-court record, that "Mr. Frazier promised the Millers that operation of WL Frazier would benefit J&W." *Id.* at 12 (citation omitted). The court also concluded that "Mr. Frazier knew that if he guaranteed the Millers a part of WL Frazier profits that they would rely on his representation." *Id.* (citation omitted).

The bankruptcy court went on to hold that the $22,296 in start-up funds provided by J&W was obtained "through a material representation [Wayne] knew was false; [he] intended to deceive the Plaintiffs; Plaintiffs justifiably relied on the false representation; and the reliance was the proximate cause of Plaintiff's loss." *Id.* at 12–13. The court then determined that the debt was not dischargeable.

Next, the court concluded that "[a] similar analysis can be used regarding the lost profits of $57,737.00," and found that amount was also not subject to discharge.  *Id*. at 13.   The bankruptcy court indicated that Wayne,

> obtained money—the lost profits—through a material misrepresentation he knew was false; [he] intended to deceive the Plaintiffs by making the representation but never intending to give the Plaintiffs an interest in the lost profits; Plaintiffs justifiably relied on the false representation by providing [Wayne] with the trucks; and the reliance was the proximate cause of Plaintiffs' loss because they could have used the trucks themselves to generate such profit.

*Id*.  Accordingly, the lost profits award was determined to be nondischargeable.

The court then moved on to the "$43,147.00 outstanding balance on the home credit line promissory note."  *Id*. at 14.  The court "conclude[d] that such is nondischargeable under Section 523(a)(6).  Even if [Wayne] did not desire harm at the time the debt was incurred, the Court concludes that [he] must have believed that the injury was substantially certain to occur as a result of his behavior."  *Id*.  The bankruptcy court's ruling was thus based on its conclusion that Wayne's conduct "was willful and malicious."  *Id*. at 15.

All told, the court held that the following debts were not dischargeable: the $80,501 Wayne owes the Millers based on fraud and misrepresentation; the $57,737 he owes in lost profits; the $43,147 he owes on the home credit line promissory note; and the $22,296 Wayne received from J&W for W. L. Frazier's start-up costs.  *Id*. at 16.  This appeal followed.[10]

## II

In a bankruptcy appeal, the district court "reviews the bankruptcy court's findings of fact for clear error and the bankruptcy court's conclusions of law de novo."  *In Re Rembert*, 141 F.3d 277, 280 (6th Cir. 1998) (quoting *In re Baker & Getty Fin. Servs., Inc.*, 106 F.3d 1255, 1259 (6th Cir. 1997)).  "A factual finding will only be clearly erroneous when, although there is evidence

---

[10] As previously noted, Wayne contests the dischargeability of all the awarded amounts, save the $80,501 based on fraud and misrepresentation.

to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Rembert*, 141 F.3d at 280 (quoting *United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir. 1993)).

## III

The bankruptcy court concluded that the amounts Wayne owes to the Millers and to J&W are excepted from discharge under 11 U.S.C. §§ 523(a)(2) and (a)(6). Specifically, the court held that the $22,296 debt to J&W and the $57,737 Wayne owes the Millers were not dischargeable pursuant to § 523(a)(2)(A). The court concluded that the $43,147 owed for the "outstanding balance on the promissory note is nondischargeable based on willful and malicious conduct under Section 523(a)(6)." Bankr. Trial Op. 16. Each award will be addressed in turn.

## A

Section 523(a)(2)(A) establishes that a discharge under § 727 does not encompass any debt "for money, property, [or] services" obtained by "false pretenses, a false representation, or actual fraud." In order to except a debt from discharge under § 523(a)(2)(A),

> A creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert*, 141 F.3d at 280–81 (citing *In Re McLaren*, 3 F.3d 958, 961 (6th Cir. 1993)). In order to except a debt from discharge, "a creditor must prove each of these elements by a preponderance of the evidence." *Rembert*, 141 F.3d at 281 (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)). In addition, "exceptions to discharge are to be strictly construed against the creditor." *Rembert*, 141 F.3d at 281 (citing *In re Ward*, 857 F.2d 1082, 1083 (6th Cir. 1988)).

**1**

Wayne first argues that the $22,296 debt he owes to J&W should be discharged because the debt was incurred through a simple "breach of contract," not because of any misrepresentations. Appellant Br. 17. He indicates that "[a]n ordinary breach of contract is not the sort of debt that § 523(a)(2) holds nondischargeable." *Id*. (citation omitted). Upon review, Wayne's argument lacks merit. The bankruptcy court's determination was the correct one—the $22,296 debt is not dischargeable—and it will be affirmed.

Wayne argues on appeal that the $22,296 J&W invested into W. L. Frazier (through the Millers) was obtained based on a promise for "future performance." *Id*. at 18. Wayne goes on to argue that a "material representation must be predicated on a statement that relates to a *past or present fact*. If the material representation in question relates to a *future promise*, the plaintiff's cause of action lies in contract, not fraud." *Id*. at 17 (emphasis in original) (citation omitted). Wayne does, however, recognize the general rule that "[a] fraudulent misrepresentation may be based upon a promise made in bad faith without intention of performance." *Id*. (citation omitted). He simply counters that his promise was not "made in bad faith with no intent to ever perform." *Id*. at 18.

Of course, this is not the argument Wayne raised before the bankruptcy court. In his trial brief there, Wayne indicated that the debt should be discharged because it was not procured through a misrepresentation at all. He did not argue, as he does now, that any misrepresentations concerned a future promise rather than a past or present fact. Bankr. R. B, at 34. Instead, before the bankruptcy court, Wayne claimed that he made no material misrepresentations at all, and that each of the four *Rembert* elements required to except a debt from discharge under § 523(a)(2)(A) had not been satisfied. *Id*. at 34–38.

As a general rule, "an appellate court will not consider arguments that are raised for the first time on appeal." *In re Lewis*, 392 B.R. 308, 313 (E.D. Mich. 2008) (citing *Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 466 (9th Cir. 1990)). "The bankruptcy court cannot have abused its discretion in failing to apply legal and equitable arguments and doctrines not presented by the moving party." *Lewis*, 392 B.R. at 314. The Court finds no basis for considering Wayne's new arguments.[11]

Further, even if the Court did consider Wayne's novel arguments, they are without merit. He argues that any misrepresentations concerned a future promise and were not made in bad faith without the intention of future performance. The record belies his contention. The bankruptcy court found that Wayne obtained start-up funds for W. L. Frazier with a promise that the Millers and J&W would benefit from W. L. Frazier's revenue. Bankr. Trial Op. 12. This finding of fact has not been undermined by anything advanced by Wayne, and a thorough review of the record only reinforces the conclusion. Because the court is not left with the "definite and firm conviction that a mistake has been committed," *Rembert*, 141 F.3d at 280 (citation omitted), this finding of fact will stand.

And if such a promise was made, it was made in bad faith without the intention of performance. Wayne testified quite clearly that he never "at any time" had "any intention of providing a share of the profits of W. L. Frazier to Jean or Howard Miller." Bankr. R. A, at 426. As Wayne points out, "a fraudulent misrepresentation may be based upon a promise made in bad faith without intention of performance." *Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653, 658 (6th Cir. 2000) (quoting *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813 (Mich.

---

[11] A court "may review an issue raised for the first time on appeal only to prevent a miscarriage of justice or when a change in the law raises a new issue while an appeal is pending, or when the issue is purely one of law," but only when "doing so would not prejudice the other party." *In re Lewis*, 392 B.R. 308, 313 (E.D. Mich. 2008) (quoting *Kimes v. Stone*, 84 F.3d 1121, 1126 (9th Cir. 1996)). There has been no miscarriage of justice or change in the law prompting Wayne's arguments, and the issue he raises involves factual determinations.

1976)); *see also Travis v. ADT Sec. Servs., Inc.*, 884 F. Supp. 2d 629, (E.D. Mich. 2012) ("fraudulent misrepresentation may be based upon a promise made in bad faith without intention of performance.") (citation omitted).  If Wayne promised to share W. L. Frazier's revenue with the Millers and J&W—a factual finding of the bankruptcy court that will not be overturned—it was a promise he made with no intention to ever perform.  Thus, even if Wayne's argument concerning differentiating misrepresentations and future promises is credited, his "future promise" still constitutes a material misrepresentation; which he knew the Millers would rely on; which they did rely on; and which caused $22,296 in damages.  The resulting debt is not dischargeable.

## 2

Wayne next attacks the bankruptcy court's conclusion that the $57,737 judgment for lost profits is not dischargeable.  As before, his arguments are without merit, and the bankruptcy court's determination will be affirmed.

Wayne argues that the bankruptcy court's determination is flawed "for the same reasons as those of the 'start up costs.'"  Appellant Br. 18.  He indicates that "[a]ny implied promise made to benefit J&W with an off-the-books relationship is, on its face, a promise for future performance."  *Id*.  Again, this is not an argument Wayne raised before the bankruptcy court, and accordingly, it should not be considered.  And as before, even if it *is* considered, the argument fails.  The record clearly establishes that Wayne never had any intention of sharing W. L. Frazier's revenue with J&W or the Millers.  Accordingly, while his promise to pay for the use of the J&W equipment did relate to future performance, it was a promise made in bad faith without any intention of performance, and therefore constitutes a false representation which excepts the debt from discharge under § 523(a)(2)(A).  *See Cook*, 210 F.3d at 658.

Wayne also argues that the bankruptcy court "clearly erred when it took at face value the calculation of damages made by the state courts." Appellant Br. 18. But Wayne forgets that the bankruptcy court relied upon the state court findings of fact "[i]n lieu of an actual trial" at the parties' request.[12] Bankr. Trial Op. 2. Moreover,

> When a court of bankruptcy elects to exercise its equitable jurisdiction . . . to determine the dischargeability of a particular debt which had been reduced to judgment prior to the adjudication in bankruptcy, the nature and character of the debt must be determined from the record of the proceedings in the court which entered the judgment.

*Harrison v. Donnelly*, 153 F.2d 588, 590 (8th Cir. 1946) (collecting cases). Therefore, the fact that the bankruptcy court relied on the state court's computation of damages is not surprising, nor was it mistaken. "The validity of a creditor's claim is determined by rules of state law. Since 1970, however, the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code." *Grogan v. Garner*, 498 U.S. 279, 283–84 (1991) (citations omitted). The bankruptcy court was tasked with determining whether the $57,737 was a dischargeable debt; not calculating the specific damage award. That was previously done by the trial court, and then affirmed by the Michigan Court of Appeals. *See J&W Transp.*, No. 289711, 2010 WL 2178555, at *12–*13.

Further, this finding of fact is not clearly erroneous. Wayne argues that the lost profits finding is inaccurate because it was not based on J&W's tax returns, which he points out indicate that "J&W . . . *never* turned a profit during its years of operation." Appellant Br. 19 (emphasis in original). Of course, Wayne omits the obvious: J&W did not turn a profit because rather than

---

[12] The Millers indicate in their appellate brief that, "[a]t a status conference held by phone on October 21, 2011, it was decided that in lieu of an actual trial on this issue, the court would consider the testimony found in the transcripts of the state trial court." Appellee Br. 7–8. An order was entered on the bankruptcy court's docket on October 21, 2011, which establishes that "[s]ince the parties were litigants in a state court proceeding, the parties wish to present the proofs for this case in the form of transcripts from the state court action . . . ." *In re Frazier*, No. 09-2183 (Bankr. E.D. Mich. 2012), Oct. 21, 2011 Order 1, ECF No. 42.

utilize its own trucks, it provided them to W. L. Frazier (expecting a return) because W. L. Frazier had achieved minority status. That J&W did not earn profits was the result of Wayne refusing to share W. L. Frazier's income—the reason this suit arose in the first place. This lack of profits is irrelevant for determining what J&W's profits could have been had it used its trucks for its own purposes. Wayne's argument, that no lost profits should be awarded because J&W earned no profits, is indeed illogical.

The bankruptcy court, like the state courts before it, based the lost profits award on the net amount W. L. Frazier earned using J&W's trucks, multiplied by a 10.97 percent profit margin, and then reduced to represent Wayne's share of J&W's profits. Wayne has presented no evidence to call this calculus into question. He offers nothing to better represent what J&W's profits would have been had they utilized their own trucks. Although Wayne indicates that "[n]othing in the record indicates that the trucks would find work, or what the effects of the prior Total termination and non-minority status would have on profits," *id.*, these remote possibilities do not leave the Court with a firm conviction that the lost-profits award was mistaken.

And, more importantly, none of this supports the conclusion that the debt was not the result of a fraudulent representation. The bankruptcy court's determination that the award of lost profits is not dischargeable will be affirmed.

**B**

The final issue concerns the $43,147 amount the bankruptcy court held was not dischargeable under § 523(a)(6). That determination will also be upheld.

Section 523(a)(6) provides that a discharge under § 727 does not affect any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The Sixth Circuit has established that "[f]rom the plain language of the statute, the judgment

-20-

must be for an injury that is both willful and malicious.   The absence of one creates a dischargeable debt." *In re Markowitz*, 190 F.3d 455, 463 (6th Cir. 1999).

The bankruptcy court held that the amount owed on the home equity promissory note ($43,147) was the result of Wayne's "willful and malicious" conduct.   Bankr. Trial Op. 15. Wayne argues that there is no evidence of willfulness or malicious intent because he did not intend to prevent the Millers from receiving payments on the note.   In support of his contention, Wayne indicates that he "made payments to J&W on account of the note.   It was only after an extended period of time that the note payments stopped and the failure to return the trucks became an issue."   Appellant Br. 22.

But Wayne does not properly explain the standard under § 523(a)(6), and accordingly, his argument misses the mark.   In *Markowitz*, the Sixth Circuit determined that pursuant to § 523(a)(6), an injury is the result of willful and malicious conduct where "the actor desires to cause consequences of his act, or . . . *believes that the consequences are substantially certain to result from it*."   190 F.3d at 464 (emphasis added) (quoting Restatement (Second) of Torts § 8A). It follows that Wayne need not have intended to prevent the Millers from collecting on their promissory note when he failed to disburse W. L. Frazier's revenue to J&W.   Instead, that he knew the consequence was "substantially certain to result" from his conduct would be enough to satisfy the standard for willful and malicious conduct under § 523(a)(6).

This standard is exactly what the bankruptcy court applied, and thus its application of the law is free from error.   As the court noted, "[e]ven if Defendant did not desire harm at the time the debt was incurred, the Court concludes that Defendant must have believed that the injury was substantially certain to occur as a result of his behavior."   Bankr. Trial Op. 14.

Moreover, the court's application of this legal standard to its factual findings was appropriate. The bankruptcy court concluded, relying on the state court transcripts, that Wayne had knowledge of the promissory note "when he continued to make payments on the loan" and because J&W's 2004–2006 tax returns "reflect the loan as an outstanding debt." *Id*. at 14–15 (citation omitted). The court also concluded that Wayne "knew that if none of the profits from WL Frazier went to J&W, that J&W would not be able to make the payments on the loan." *Id*. at 15. In finding Wayne's conduct was willful and malicious, the court also relied on Wayne's "failure to comply with a court order to return all of the trucks, and the subsequent charge of criminal contempt against him." *Id*. Finally, the court noted the state court's conclusion that "Mr. Frazier's conduct is so willful and wanton that it demonstrates a reckless disregard for the rights of Plaintiffs." *Id*. at 16 (citation omitted). The court indicated that it drew "the same factual findings, with the conclusion that [Wayne's] debts to [the Millers] are excepted from discharge." *Id*.

Wayne offers no evidence to indicate any of the foregoing factual findings are clearly erroneous. In fact, he offers nothing whatsoever to support the conclusions that he was not aware of the promissory note, or that he believed payments would be made even if he transferred no profits to J&W's account. Upon review, the record supports these factual conclusions.

And when the proper legal standard, as identified by the bankruptcy court, is applied to these factual findings, the conclusion remains. The harm Wayne caused, the outstanding debt on Howard's promissory note, was "substantially certain to result" from the situation where he failed to share W. L. Frazier's profits with J&W. The fact that he made some of the payments for a time is irrelevant—he stopped making payments to J&W as of early 2007. Such conduct led to the unavoidable result that J&W would cease payment on Howard's promissory note. A

note Wayne was aware of.  Because the debt arose from a "willful and malicious injury" caused by Wayne's conduct, the debt is not dischargeable under § 523(a)(6).  The bankruptcy court's holding on this issue will be affirmed.

**IV**

Accordingly, the bankruptcy court's determinations of non-dischargeability are **AFFIRMED**.

Dated: July 22, 2013                                s/Thomas L. Ludington
                                                    THOMAS L. LUDINGTON
                                                    United States District Judge

<div style="border:1px solid black">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 22, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS

</div>